THE CHICAGO AUDITORIUM ASSOCIATION, Plaintiff in Error, *vs.* THE CORPORATION OF THE FINE ARTS BUILDING, Defendant in Error.

*Opinion filed April 21, 1910.*

1. LEASES—*rules applicable to construction of contracts apply to construction of leases.* The same rules of law are applicable to the construction of leases that are applicable to the construction of other contracts, and where the language of a lease is the subject of construction, the object to be attained is to ascertain the intention of the parties and give effect to that intention.

2. SAME—*preliminary negotiations may be considered in construing language of lease.* Preliminary negotiations, including the written options preceding the execution of a ninety-nine year lease, may be considered for the purpose of determining the meaning and intention of the parties in the use of words employed in the lease, but not for the purpose of varying or contradicting the plain terms of the instrument.

3. SAME—*term "demised premises" construed as meaning entire lots.* The term "demised premises," used in two ninety-nine year leases of adjoining lots, will be construed as meaning the entire lots and not merely those portions in the exclusive and unrestricted possession of the lessee, where it appears that such restrictions were in the nature of an inducement to the lessor to make the lease to the lot adjoining his building, and that they were not treated then, nor for twenty years thereafter, as having any effect upon the rentals agreed to be paid.

4. APPRAISEMENT—*appraisements are not governed by rules governing arbitrations.* The rules governing appraisements are not the same as the rules governing arbitrations.

5. SAME—*party knowing the facts should object to appraiser before appraisement is returned.* If the lessee in a ninety-nine year lease knows that the appraiser selected by the lessor, under the terms of the lease, owns property very near to the leased premises and that he has manifested some partiality in favor of the lessor, he should object to the competency and fairness of such appraiser before the hearing is concluded and the appraisement made, signed and returned.

6. SAME—*when appraisement of leased premises will not be set aside.* An appraisement of leased premises, agreed upon and returned by one of the two appraisers appointed, respectively, by the lessor and the lessee and the third appraiser selected by the

two appointed, will not be set aside, where the appraisers heard the evidence of witnesses produced by the respective parties and fixed the value of the premises within the range of such evidence, although they were not required to hear any evidence or confine themselves to the evidence if heard.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding.

The Chicago Auditorium Association filed its bill in the circuit court of Cook county against the Corporation of the Fine Arts Building, praying that a certain appraisement be declared void which fixed the cash value of two lots, exclusive of improvements, in the city of Chicago, leased to complainant by the grantor of defendant for the term of ninety-nine years from the first day of February, 1887. The appraisement was made pursuant to the terms of two leases demising the lots and for the purpose of ascertaining the rental thereon to be paid by the lessee for the period of ten years from August 1, 1906. At the time the leases were made, Studebaker Bros. Manufacturing Company was the owner of the lots, which were numbered 18 and 19 of a certain subdivision and had a combined frontage on Michigan avenue of 52.67 feet and a uniform depth, extending westward, of 171.68 feet. Lot 18 is immediately north of lot 19, and a valuable business building owned by the Studebaker company occupied the ground adjoining lot 18 on the north. Complainant, the Chicago Auditorium Association, had just been incorporated and had in contemplation the erection of the building on Michigan avenue known as "The Auditorium." Some preliminary negotiations were carried on between the representatives of complainant and the owner of the lots, during which the architect's plans of the building to be erected were submitted and considered, and the parties having come to an

agreement, on February 1, 1887, executed two leases, one
on each lot, and a certain contemporaneous contract relat-
ing to the use of the demised premises and the improve-
ments to be placed thereon, which it was agreed should be
construed with the leases and as a part of the same trans-
action. The leases were identical in form. One of them
leased and demised lot 18 and the other lot 19. By the
terms of each lease the lessor, the Studebaker Bros. Manu-
facturing Company, leased to complainant the respective lot
described, for the term of ninety-nine years from and after
the first day of August, 1886. The lessee agreed to build
on the demised premises a substantial fire-proof building
to comply with the ordinances of the city of Chicago and
to cost not less than $50,000, and to have the same com-
pleted before August 1, 1889. Complainant also agreed to
pay as rent for said demised premises for the first year of
the term $1050, and for the next nineteen years,—that is,
until the first day of August, 1906,—a yearly rental of
$1800. It was further agreed that for the remainder of
the term,—that is, from August 1, 1906, to August 1,
1985,—complainant should pay as annual rental "a sum of
money equal to six per cent of the fair cash value of said
demised premises, exclusive of improvements placed there-
on by said lessee, its successors or assigns." In order to
ascertain the fair cash value of the demised premises it was
provided an appraisement thereof should be made sixty
days preceding August 1, 1906, and every ten years there-
after during the term of the lease, and the value determined
upon at each appraisement should be considered as the fair
cash value for the ten years next ensuing. Each party to
the lease, or their successors, was to select a disinterested
person as appraiser, who should be at the time a resident
of Cook county and the owner in fee of real estate in that
part of Chicago bounded by the Chicago river on the north
and west, Lake Michigan on the east and Peck court on
the south. The two appraisers thus chosen were to select

a third appraiser possessing like qualifications. It was provided that it should not be incumbent upon the appraisers to give any notice of the time and place of holding their meetings or to hear any evidence or arguments, and the award in writing, under oath, of the appraisers, or a majority of them, of the then value of said demised premises, exclusive of the improvements thereon, should be binding on the parties to the lease. All expenses of the appraisal, including a reasonable compensation to the appraisers, were to be paid equally by the respective parties. The lessee further agreed to pay all water rates and all taxes and assessments, general and special, which might be levied during the continuance of the lease on the demised premises, or upon any building, addition or improvement of any kind which might be erected thereon during the term of the lease.

The agreement entered into contemporaneously with the leases provided that the party of the second part (complainant) should construct and maintain during the term of the leases a driveway not less than fifteen feet in width along the entire north side of the demised premises, and the party of the first part, or subsequent owners or occupants of the premises next north and adjacent to the driveway, should have the right to jointly use the same without contributing to the cost of its maintenance. The right was granted to the second party to join to and use so much of the south wall of the building upon the premises next north of and adjoining the demised premises as should be beneath the level of the driveway, with the right to cut into said wall for the purpose of affording a support to the beams upon which the driveway was to be constructed. It was agreed that the east seventeen and one-half feet of the north fifteen feet of lot 18 should at all times be kept free and clear of all buildings, improvements and obstructions of every kind, above the driveway. The second party also had the right to join to and use so much of the west

thirty-four feet and eight inches of the east fifty-two feet and two inches west of the west line of Michigan avenue of the south wall of the building next adjoining on the north that was above the driveway. Any windows in said wall could be removed and filled with masonry in case the wall was so used. It was further provided that the first party should have the right to build over that part of the west ninety-six and one-half feet of the demised premises lying north of the north main wall proposed to be built on said premises as shown upon the plans prepared by Adler & Sullivan, a copy of which was attached to the contract. The buildings of the first party to be thus constructed were to be wholly above the fourth story of the building to be erected on said premises by the party of the second part and to be constructed of material and in manner equally fire-proof with said building. It was further covenanted and agreed that the rights of the parties to the agreement should be in all respects the same as though the provisions therein contained had been incorporated into the ground leases before mentioned.

In May, 1906, defendant selected R. Hall McCormick as its appraiser, under the terms and provisions of the leases and agreement, to appraise the property for the purpose of determining its rental value for the ensuing ten years. Complainant selected Thomas M. Hoyne to act as one of the appraisers, and the two appraisers so selected chose Nathaniel C. Sears as the third appraiser. These appraisers did not fix the valuation upon the property upon their own judgment, alone, as to its value, but heard the opinions of reputable real estate men produced by both the complainant and defendant, and at which hearings complainant and defendant were represented by counsel. McCormick and Sears agreed and made a report in writing, under oath, appraising the value of lots 18 and 19 at $8000 per lineal foot. Hoyne did not agree with his two co-

appraisers and refused to unite with them in their report of the appraisement.

The bill in this case was filed to set aside the appraisement on two grounds: First, that the appraisers did not appraise the demised premises, but by mistake appraised the whole of both lots, exclusive of improvements, without taking into consideration the restrictions in the leases or the rights conferred by the lessee upon the lessor in portions of the premises described in the leases; second, it is charged in the bill that McCormick, the appraiser selected by defendant, was a prejudiced and unfair appraiser; that he owned property within four hundred feet of the property he was selected to appraise, and that he acted, in making the appraisement, as the partisan and representative of defendant, and by reason of his acts in this respect the bill charges complainant was deprived of an impartial and unprejudiced appraisement. Upon a hearing in the circuit court of Cook county a decree was entered denying the relief prayed and dismissing the bill. Upon an appeal by complainant to the Appellate Court for the First District the decree was affirmed. Upon petition of complainant below it was ordered by this court that the case be certified here for review.

JUDAH, WILLARD, WOLF & REICHMANN, for plaintiff in error.

WILSON, MOORE & MCILVAINE, for defendant in error.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

The leases of the two lots 18 and 19 were identical in form and contained no restrictions or reservations. By the agreement executed contemporaneously with the leases, certain restrictions as to the use of a portion of the lots were made, as shown in the preceding statement, and cer-

tain rights and privileges were granted to the defendant. Complainant contends that this amounted to an exception or reservation of a portion of the premises and cannot be treated as a part of the demised premises; that in appraising the demised premises the appraisement should be made subject to the limitations and restrictions. As made, the appraisement was based upon the value of the two lots without any reference to the restrictions as to their use. The leases, as we have said, were identical except as to the description of the lots, and each provided that for the first year of the term complainant should pay as rent for the "demised premises" $1050 and for the next nineteen years $1800, and for the residue of the term a sum equal to six per cent of the fair cash value of the "demised premises," exclusive of the improvements placed thereon by the lessee, said fair cash value to be ascertained by an appraisement on the first day of August, 1906, and every ten years thereafter.

Complainant insists that the words "demised premises," which words frequently occur in the leases, mean only the portions of the lots of which it had exclusive possession and the unrestricted use. In determining this question we do not think we can be guided, alone, by the general rules and principles of law applicable to exceptions and reservations in leases. The same rules of law are applicable to the construction of leases that are applicable to the construction of other contracts, and where the language of a lease is the subject of construction, the object to be attained is to ascertain, if it can be done, the intention of the parties to the instrument and give effect to that intention. If the language is plain and unambiguous, proof *aliunde* cannot be heard to contradict or vary its meaning or give it a meaning inconsistent with the language used in the instrument. The leases here involved we think do not belong to that class of instruments but require a construction that will give effect to the intention of the par-

ties.   To aid in the attainment of this object it was said in *Street* v. *Chicago Wharfing Co.* 157 Ill. 605, at page 614: "The court will, if necessary, put itself in the place of the parties and read the contract in the light of the circumstances surrounding them at the time it was made and of the objects which they then evidently had in view.   So, also, the acts of the parties themselves, indicative of their construction placed upon it, may be resorted to for the purpose of determining the true meaning of the written agreement.   And in this regard it makes no difference whether such acts are contemporaneous or subsequent."   Preliminary negotiations may be considered for the purpose of determining the meaning and intention of the parties in the use of the words employed in the instrument, but not for the purpose of varying or contradicting the plain terms of the instrument.   (*Stoops* v. *Smith,* 100 Mass. 63; (1 Am. Rep. 85;) *Sweat* v. *Shumway,* 102 Mass. 365; (3 Am. Rep. 471;) 17 Am. & Eng. Ency. of Law, 23.)   In our opinion the written options preceding the execution of the leases and agreement afford some light in ascertaining the understanding and meaning of the parties and are competent to be considered for that purpose.

On the 16th of June, 1886, the Studebaker company gave to Ferd W. Peck, who represented the Chicago Auditorium Association, an option for a lease on lot 19 for ninety-nine years, at a rental of $1800 per annum and taxes for the first twenty years.   After the end of twenty years the ground was to be re-valued every ten years, and the rent to be paid thereafter was to be six per cent on the valuation and the taxes.   This option was for sixty days but was extended twice, the last time until January 15, 1887.   On the 6th of October, 1886, the Studebaker company gave to the same party an option on lot 18 for a term of ninety-nine years for the same rental as was provided for in the option for lot 19.   The option for the lease of lot 18 reads as follows:

"*Studebaker Bros. Manufacturing Co.,*
CARRIAGE BUILDERS,
CHICAGO, *Oct. 6, 1886.*

"*Mr. Ferd Peck, City.*

"DEAR SIR—We will lease you, or a company to be organized by you, the lot known as the Sexton lot, adjoining our new building on Michigan avenue on the south, for the term of ninety-nine years for $1800 (eighteen hundred dollars) per year and taxes, re-valuation every twenty years, with the understanding that you improve it as we talked with your architect, Mr. Adler, which will be about as follows: You to leave a driveway there some fourteen feet, giving us and our assigns the right to use that during the life of the lease, and we also to give you permission to join our building as per your drawings, and you to give us the right to run up a building three or four stories on top of your building which you propose to construct, which will cover about twelve feet by seventy on the south part of the rear of the Sexton lot. The lease to be drawn in the usual form as such leases are made. This proposition to be good for sixty days.

STUDEBAKER BROS. MANF. CO.
By P. E. Studebaker, *Treas.*"

This option was for sixty days but was extended to January 15, 1887, "with the proviso that the rent shall commence from January 1, 1887, and that the rent shall be paid quarterly, and that the driveway must be reserved as per enclosed proposition." Both options were accepted by Mr. Peck, on behalf of the Auditorium Association, on the 14th of January, 1887. The leases were drawn up and dated February 1, 1887, and were acknowledged by the lessor February 5 and by the lessee February 7. The option for the lease of lot 19 was for its unrestricted use and occupation by the lessee. Each option was independent of the other and the privilege of leasing one of the lots did not depend upon the leasing of the other one. It does not appear that the plans of the building proposed to be erected by the Auditorium Association were exhibited to the Studebaker company when the option was given to lease lot 19, and no right was proposed to be granted by the lessee to the lessor in any part of said lot 19 during the term of the lease. When it was proposed to lease lot 18 a different situation was presented. The fire-proof business

building of the Studebaker company adjoined that lot on the north side, and the erection of a building upon said lot would necessarily affect the Studebaker company's building. It appears from the option given on lot 18 that plans of the building proposed to be erected thereon by the lessee were exhibited to the Studebaker company and some talk had between the representatives of that company and the architect of the proposed building, representing the lessee, as to how the lot should be improved. The proposition, in substance, was, that the Studebaker company would lease lot 18 for the term and upon the rentals named, to be improved by the lessee according to the representations made by its architect, and the lessee was to give the lessor the right to use the driveway and to run up a building over a portion of the premises on top of the building the lessee proposed to construct, the lessee to have the right to join its proposed building to the south wall of the lessor's building. As the erection of a building on lot 18 would interfere with light and air on the south side of the lessor's building, it is a fair assumption that the lease to that lot could not be obtained for that purpose without informing the lessor of the character of the improvements proposed to be made and granting to it certain concessions, rights and privileges. When the leases were executed they made no mention of these concessions, rights and privileges, but they were granted in the instrument executed contemporaneously with the leases. Neither in the option, leases nor contemporaneous agreement is there any intimation that the rentals agreed to be paid were to be in anywise affected by the rights and privileges granted to the lessor to use a portion of the premises.

It seems clear to us that the parties understood and meant by the words "demised premises" the whole of lots 18 and 19, and that the rights granted the lessor were by way of inducement to secure the lease on lot 18. For nineteen years the lessee paid the rent provided by the leases, of

$1800 for each lot, and also paid all taxes and assessments on said lots as provided by the leases. We think we are justified in assuming that at the time the options were given and the leases executed the lots were of equal rental value. They were substantially of the same size and lay side by side. The erection of a building on lot 19 would not seriously affect the Studebaker company's building, but the erection of a building on lot 18 would do so if authorized without any restrictions. It would therefore seem a reasonable act on the part of the owner to impose conditions upon the character of the improvements to be placed upon and the use to be made of lot 18 as an inducement to lease it. Complainant accepted the conditions imposed, and we cannot construe its acts and conduct in paying the rent reserved in the leases and the taxes on the lots every year, up to 1906, in any other light than as a recognition on its part that it understood the "demised premises" to mean the whole of both lots, without regard to the restrictions. It is worthy of note that the proposition to lease complainant lot 19, and which was accepted by it, contained no conditions whatever. The option and the lease for this lot were independent of the option and lease of lot 18. As an inducement to procure a lease on lot 18 complainant granted the Studebaker company the right to occupy a portion of the rear of lot 19 above the fourth story of complainant's building. The Studebaker company exercised this right by erecting a building on the top of complainant's building over a portion of the rear of lot 19, about ten by seventy feet in dimensions. This right granted the Studebaker company formed no part of the inducement for lot 19 and could only have been a part of the inducement for leasing lot 18. During all the years up to 1906 complainant paid the rent reserved in the lease for lot 19, and all taxes thereon, without, so far as this record shows, claiming any reduction on account of the use of a portion of the lot above the fourth story by the lessor. It appears to us that if the

premises for which complainant was required to pay rent meant in 1906 only those portions of said lots that it had the exclusive possession of, the same thing was true when the leases were executed.   If it was entitled in 1906 to have the lessor's occupancy above the fourth floor of a part of lot 19 considered in determining the rental to be paid thereafter, we see no reason why it did not have the same right during all the years prior to 1906.   To our minds the conclusion seems irresistible, when the acts and conduct of the parties are considered together with the written leases and agreement, that the circuit and Appellate Courts placed the proper construction upon said leases.

We do not think there is any basis for relief for complainant on the ground of the prejudice or improper conduct of appraiser McCormick.   It is true, he owned real estate not far distant from the property he was selected to appraise, but it was within the limits of the territory in which the lease required the appraisers selected should own real estate in fee.   The lease required the persons selected as appraisers to be residents of Cook county and the owners in fee of real estate in that part of Chicago south and east of the Chicago river, west of Lake Michigan and north of Peck court, and that they should not be related to any of the parties by consanguinity or affinity.   Mr. McCormick possessed the necessary qualifications, and the fact that he was the owner of real estate only a few hundred feet distant from the property to be appraised was known to complainant.   The lease provided that it should not be incumbent upon the appraisers to hear evidence or arguments in making the appraisement.   They did, however, do so, and the parties were represented by their respective counsel, and each produced witnesses who testified as to their opinion of the value of the property.   The value testified to by the witnesses ranged from $7000 to $10,000 per lineal foot and the appraisement was fixed by McCormick and Sears at $8000 per lineal foot.   It is true, Mc-

Cormick did not confine himself to the testimony of the witnesses at the public hearings as the only source of information to aid him in arriving at a conclusion as to the value of the property, but this he was not required to do. (*Pearson* v. *Sanderson,* 128 Ill. 88.)   If it be true that McCormick, prior to the making of the appraisement, manifested apparent partiality in favor of defendant and interest in its favor in fixing the appraisement, when made it was well within the testimony of witnesses who were called to testify on account of their supposed qualifications and knowledge of the value of real estate.   In view of the testimony of these witnesses it cannot be said that the appraisement was contrary to the evidence and should be set aside on that ground.   It cannot be denied that if the validity of the appraisement depended entirely upon the testimony of the witnesses it could not be set aside on the ground that it was not sustained by the evidence.   The rules governing appraisements are not the same as the rules governing arbitrations.   (*Pearson* v. *Sanderson, supra.*) Moreover, complainant knew of McCormick's ownership of real estate near the property to be appraised and knew of his acts and conduct now complained of before the appraisement was agreed upon, signed and returned, but made no objections to his acting as appraiser.   The time to have objected to his competency and fairness as an appraiser was before the hearings were concluded and the appraisement made and returned.   (*Story* v. *DeArmond,* 179 Ill. 510.)   No criticism is made of the fairness and competency of appraiser Sears, who joined with McCormick in the appraisement.   Appraiser Hoyne, in stating his reasons for not joining with the other appraisers in the report, does not question the valuation fixed on the premises, but bases his refusal to join in the report on the ground that the restrictions and exceptions provided for in the contract were not considered but a valuation placed on the land without regard to any exceptions or limitations.

We are unable to see any ground upon which complainant is entitled to the relief prayed, and the judgment of the Appellate Court is affirmed.  *Judgment affirmed.*